**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTHONY PEPE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>COCRYSTAL PHARMA, INC. F/K/A BIOZONE PHARMACEUTICALS, INC., ELLIOT MAZA, GARY WILCOX, JEFFREY MECKLER, GERALD MCGUIRE, JAMES MARTIN, CURTIS DALE, PHILLIP FROST, BARRY C. HONIG, JOHN STETSON, MICHAEL BRAUSER, JOHN O'ROURKE III, MARK GROUSSMAN, BRIAN KELLER, AND JOHN H. FORD,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Anthony Pepe ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon

1

personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Cocrystal Pharma, Inc. f/k/a/ BioZone Pharmaceuticals, Inc. ("Cocrystal" or the "Company")[1], as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded Cocrystal and/or BioZone securities from September 23, 2013 through September 7, 2018, both dates inclusive ("Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

---

[1] "Cocrystal" is used herein to include BioZone Pharmaceuticals, Inc. ("BioZone") unless otherwise indicated.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 9(a) and (f), 10(b), 20(a), and 20(b) of the Exchange Act (15 U.S.C. §§ 78i(a), 78i(f), 78j(b), 78t(a), 78t(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as Defendants conducts business in this district and a significant portion of the Defendants' actions and the subsequent damages took place within this District.

5.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying PSLRA Certification, acquired Cocrystal securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

3

7.     Defendant Cocrystal, is a clinical stage biotechnology company discovering and developing novel antiviral therapeutics that target the replication machinery of hepatitis viruses, influenza viruses, and noroviruses. The Company is a Delaware corporation with headquarters in Tucker, Georgia.  Cocrystal securities trade on NASDAQ under the symbol "COCP." On March 12, 2018, Cocrystal securities began trading on NASDAQ as they previously traded on the OTC. Prior to a merger with BioZone in 2014, shares of BioZone traded on the OTC under the ticker symbol "BNZE." There was a 1-for-30 reverse stock split on January 24, 2018. During the time period from January 24, 2018 and the following 20 business days, the ticker was "COCPD" but thereafter resumed trading under the ticker "COCP." BioZone was headquartered in Englewood Cliffs, New Jersey.

8.     Defendant Elliot Maza ("Maza") was the Chief Executive Officer ("CEO") of the Company from June 2011 to January 2014.

9.     Defendant Gary Wilcox ("Wilcox") served as the Company's CEO from January 2014 until March 2015, has been Interim CEO since July 2016, and has been a member of the Board of Directors ("Board") of the Company.

10.     Defendant Jeffrey Meckler ("Meckler") was the Company's CEO from October 2015 to July 2016. Meckler served as Interim CEO from March 2015 until October 2015.

4

11.     Defendant Gerald McGuire ("McGuire") was the Company's Chief Financial Officer ("CFO") and Treasure from January 2014 until November 2015.

12.     Defendant James Martin ("Martin") has been the Company's CFO since June 2017. Martin served as the Company's Interim CFO from February 2017 until June 2017.

13.     Defendant Curtis Dale ("Dale") was the Company's CFO from November 2015 until January 2017.

14.     Defendant Phillip Frost ("Frost") has been a Director and a shareholder of the Company since before the beginning of the Class Period.

15.     Defendant Barry C. Honig ("Honig") was a shareholder of BioZone and participated in a scheme to artificially inflate the price of BioZone securities.

16.     Defendant John Stetson ("Stetson") was a shareholder of BioZone and participated in a scheme to artificially inflate the price of BioZone securities.

17.     Defendant Michael Brauser ("Brauser") was a shareholder of BioZone and participated in a scheme to artificially inflate the price of BioZone securities.

18.     Defendant John O'Rourke III ("O'Rourke") was a shareholder of BioZone and participated in a scheme to artificially inflate the price of BioZone securities.

19.     Defendant Mark Groussman ("Groussman") was a shareholder of BioZone and participated in a scheme to artificially inflate the price of BioZone securities.

20.     Defendant Brian Keller ("Keller") was the Chief Scientific Officer of BioZone, a Director of the Board, and a shareholder of BioZone. Defendant Keller participated in a scheme to artificially inflate the price of BioZone securities.

21.     Defendant John H. Ford ("Ford") was a stock promoter who was retained to write favorable articles about BioZone on the *Seeking Alpha* website.

22.     Defendants Maza, Wilcox, Meckler, McGuire, Martin and Dale are herein referred to as the "Officer Defendants."

23.     Defendants Frost, Maza, Honig, Stetson, Brauser, O'Rourke, Groussman, Keller, and Ford are herein referred to as the "Scheme Defendants."

24.     Defendants Maza, Wilcox, Meckler, McGuire, Martin, Dale, Frost, Honig, Stetson, Brauser, O'Rourke, Groussman, Keller, and Ford are herein referred to as "Individual Defendants."

25.     Collectively, Defendant Cocrystal and Individual Defendants are herein referred to as "Defendants."

26.     Each of the Officer Defendants:

        a.      directly participated in the management of the Company;

     b.     was directly involved in the day-to-day operations of the Company at the highest levels;

     c.     was privy to confidential proprietary information concerning the Company and its business and operations;

     d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

     e.     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

     f.     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

     g.     approved or ratified these statements in violation of the federal securities laws.

27.    Cocrystal is liable for the acts of the Officer Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

28.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Cocrystal under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS
### Background

29.     In November 2010, Honig, Stetson, and Groussman purchased one-third of a publicly-traded shell company. In December 2010, Frost and Brauser each purchased one-half of the remaining two-thirds of the shell company. Honig, Stetson, Groussman, Frost, and Brauser disguised their roles in the purchase of the shell company by purchasing shares through an entity. An associate of Frost was installed as the sole director of the shell company.

30.     In late 2010, Honig, Brauser, and Frost approached the management of a private biotech company, including Keller, who was the Chief Scientific Officer and a director, to discuss taking the biotech company public through a reverse merger. Although the merger of the publicly-traded shell and the private company faced an obstacle when the bank which was providing a line of credit to the private company would not approve the merger in 2011, the merger still closed in June 2011 and the bank sent a default notice.

31.     This reverse merger resulted in the creation of BioZone.

32.     Honig, Brauser, and Frost were not only the controlling shareholders of BioZone, but exercised control over BioZone's management, including over Maza. With Frost, Stetson, and Groussman's knowledge and consent, Honig and Brauser installed Maza as CEO of BioZone.  During his tenure as CEO of BioZone, Maza did what Honig and Brauser told him to do and sought their approval for BioZone's business decisions.

33.     Keller, Maza, and an associate of Frost concealed Honig's and Brauser's control of BioZone by signing company public filings that failed to disclose the involvement of Honig, Brauser, Stetson, and Groussman. This includes BioZone's Form 10-K filed on April 16, 2012. Keller and Maza knew that Honig and Brauser, with Frost's knowledge and consent, controlled BioZone's management and thus the filings were false. BioZone's filings only identified Frost as a control person and not Honig and Brauser.

34.     Maza and Keller went along with Honig, Brauser, and Frost's control because they were promised, and ultimately rewarded, substantial salaries and millions of BioZone shares.

35.     By April 1, 2013, Honig, Frost, Brauser, Maza, Keller, and an associate of Frost entered into an agreement to purchase, hold, or sell their shares in concert. They amassed over 44 million BioZone shares which equaled almost 71% of the BioZone.

36.    Beginning in August and September 2013, Stetson, at Honig's direction, deposited almost 4 million shares of BioZone that had been issued to Honig in a brokerage account. With the deposit of these shares, Stetson falsely denied any relationship between Honig, BioZone, or its affiliates. Honig signed the submission for the deposit of these shares knowing that it was false. On September 4, 2013, Stetson aided in obtaining the issuance of a false attorney opinion letter to BioZone's transfer agent in order to remove restrictive legends from Honig's share certifications. These opinion letters falsely stated that Honig was not an affiliate of BioZone, which Stetson knew was false. To aid in depositing Honig's shares with a broker, Maza was also required to issue a letter to confirm the authenticity of the stock certificates, which he did. Maza knew, or was reckless in not knowing, that statements in his letter regarding Honig not being a BioZone affiliate was false. Since Honig was a Company affiliate, his shares would be subject to volume limitations under the federal securities laws.

37.    In September 2013, the restrictions on Honig's shares was removed, deposited into a brokerage account, and ready to be sold. Honig directed his associate, O'Rourke, to reach out to Ford, a stock promoter who regularly provided investment analysis on the website *Seeking Alpha*. O'Rourke asked that Ford write an article on *Seeking Alpha* promoting BioZone in exchange for below-market price BioZone shares. O'Rourke instructed Ford to write a favorable article about BioZone

emphasizing Frost's involvement as he was a well-known billionaire and successful biotech investor.

**Defendants' False and Misleading Class Period Statements**

38.     On September 23, 2013, Honig and several of his associates began trading BioZone securities to create the appearance of market activity in advance of Ford's anticipated article. The same day, Honig was able to pay Ford for the upcoming favorable article. O'Rourke called Ford and told him to place buy orders for BioZone at $0.40 and made sure it was executed against a corresponding sale placed by Honig. Honig sold 180,000 shares to Ford at the coordinated rate of $0.40.

39.     Further on September 23, 2013, O'Rourke put in the last trade of the day in BioZone to ensure that the price would be higher and giving the false impression that the stock price was increasing as the market closed.

40.     On September 26, 2013, Honig and his associates engaged in coordinated trades to enhance the false impression of an active market for BioZone securities.

41.     On September 26, 2013, less than a half hour before market close, the article written by Ford, "Opko and Its Billionaire CEO Invested in BioZone" appeared on *Seeking Alpha*. As part of a scheme to inflate the price of BioZone securities, the article touted BioZone by using Defendant Frost's ownership in BioZone and reputation as a successful biotech investor. The article also contained

a quote from Keller touting the benefits of BioZone's technology, Qusomes – a patented technology aimed to be used in large-scale drug markets. The article also misleadingly stated that BioZone had a formulation ready to be tested and brought to the billion-dollar injectable drug market.

42.     Ford's *Seeking Alpha* article did not disclose that he was compensated by Honig to write the article. In fact, Ford stated the opposite: "I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."

43.     As a result of Ford's *Seeking Alpha* article, trading volume in BioZone increased from about 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013, and more than 6 million shares on October 2, 2013. The share price increased from an average in August 2013 of $0.48 to $0.97 on October 17, 2013.

44.     Between September 26, 2013 and December 31, 2013, Honig, Brauser, Frost, Groussman, Stetson, O'Rourke, and a few entities controlled by these individuals, sold over 15.7 million shares of BioZone and received proceeds of over $9.2 million.

45.     On November 18, 2013, the Company filed a Form 10-Q for the quarter ended September 30, 2013 (the "3Q 2013 10-Q") with the SEC, which provided the

Company's third quarter 2017 financial results and position. The 3Q 2013 10-Q was signed by Defendant Maza. The 3Q 2013 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Maza attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

46.    On November 27, 2013, BioZone issued a press release entitled, "BioZone Pharmaceuticals Announces Executed Letter of Intent to Merge With Cocrystal Discovery Inc." The press release detailed the anticipated transaction, stating in relevant part:

> ENGLEWOOD CLIFFS, NJ--(Marketwired - November 27, 2013) - BioZone Pharmaceuticals, Inc. (OTCBB: BZNE) today announced that it has agreed to terms and signed a Letter of Intent to merge with Cocrystal Discovery, Inc., a privately-held, biotechnology company developing antiviral therapeutics for human diseases. Cocrystal Discovery has breakthrough technologies that enable the creation of first- and best-in-class antivirals.
>
> **Cocrystal Discovery has previously received strategic investments from Teva Pharmaceuticals (NYSE: TEVA), Opko Health (NYSE: OPK), and The Frost Group. Opko Health and The Frost Group together own approximately 40% of Cocrystal Discovery.**
>
> Cocrystal Discovery has five therapeutic programs targeting the Hepatitis C Virus (HCV), Influenza, the Human Rhinovirus (HRV), Dengue, and the Norovirus. The Hepatitis C Virus is the cause of 170 million chronic infections worldwide and has created a market for treatment of $6 billion in 2012 that is projected to grow to $20 billion by 2020. Cocrystal Discovery is targeting two Hepatitis C replication enzymes, with its Polymerase program at lead optimization stage and its Helicase program at lead identification stage. Cocrystal Discovery's

Influenza, HRV, Dengue, and Norovius programs are targeting unmet multi-billion dollar market opportunities with first-in-class antivirals.

Dr. Gary Wilcox, the existing Chief Executive Officer and Chairman of Cocrystal Discovery, will become the Chief Executive Officer and Chairman of the combined company. Dr. Wilcox served on the Board of Directors and was Executive Vice President of Operations at Icos Corporation from 1993 through its sale to Eli Lilly (NYSE: LLY) for $2.3 billion in 2007. At Icos he led the teams developing Cialis, which now has annual sales over $2 billion, and had notable large investors including Bill Gates backing the company.

"We believe this merger will significantly enhance our ability to bring our small molecule inhibitors of the viral replication complex to market," commented Dr. Wilcox. "Drs. Frost and Hsiao have a proven track record of driving healthcare innovation while creating significant value for shareholders. We believe in our ability to discover oral, once-a-day, broad-spectrum antiviral drug candidates targeting the polymerase enzyme of the Hepatitis C virus. Our other first-in-class therapeutic programs have the potential to be billion dollar opportunities as well."

Dr. Roger Kornberg, Chief Scientist and a Director of Cocrystal Discovery, will keep the title of Chief Scientist of the combined company. Dr. Kornberg received the 2006 Nobel Prize in Chemistry and is Professor of Structural Biology at Stanford University School of Medicine.

**Dr. Phillip Frost and Dr. Jane Hsiao are current Directors at Cocrystal. Dr. Frost is the Chairman and CEO of Opko Health, Inc, and the Chairman of the Board of Teva Pharmaceuticals.** Dr. Hsiao is Vice Chairman and Chief Technical Officer of Opko Health, Inc.

Dr. Frost commented, "We are excited about the breadth of the management team at Cocrystal Discovery. There are compelling advantages to the technologies for small molecule inhibitors of the viral replication complex. In addition to the groundbreaking technology that Cocrystal Discovery possesses, I am always one to bet on management. With Dr. Wilcox's top-notch pedigree and successes in bringing products to market, I am confident in the future of this company. This

merger will provide greater resources to help bring products of the combined company to market and offer shareholders an opportunity to realize significant value on their investment."

Under the terms of the merger agreement, current shareholders of BioZone Pharmaceuticals and Cocrystal Discovery will own approximately 40% and 60% of the combined company, respectively. The Merger is expected to close at the end of 2013, and is subject to customary conditions to closing as detailed in the Merger Agreement. The structure of the transaction will be in the form of a reverse merger with Cocrystal Pharma, Inc. as the surviving corporation and will now be headquartered in Bothell, WA. The combined company will initially continue to trade on the OTCBB under the symbol BZNE.

(Emphasis added).

47.    On January 3, 2014, BioZone announced that it finalized a planned merger with Cocrystal Discovery, Inc., issuing the press release entitled, "BioZone Completes Acquisition of Cocrystal Discovery and Begins Transformation to High Growth Biotech Company" which stated in relevant part:

ENGLEWOOD CLIFFS, NJ--(Marketwired - January 03, 2014) - BioZone Pharmaceuticals, Inc. (OTCQB: BZNE) today announced that it has finalized its planned merger with Cocrystal Discovery, Inc., a privately-held, biotechnology company developing antiviral therapeutics for human diseases. Cocrystal Discovery has previously received strategic investments from Teva Pharmaceuticals (NYSE: TEVA), Opko Health (NYSE MKT: OPK) and The Frost Group.

Concurrent with the closing of the merger, Dr. Gary Wilcox has been appointed Chief Executive Officer and Chairman of the Board. Dr. Wilcox previously served on the Board of Directors and was Executive Vice President of Operations at Icos Corporation from 1993 through its sale to Eli Lilly for $2.3 billion in 2007. At Icos he led the team developing Cialis, which now has annual sales over $2 billion. Additionally, Dr. Roger Kornberg, has been appointed Chief Scientist and a Director of the combined entities. Dr. Kornberg received the 2006

Nobel Prize in Chemistry and is Professor of Structural Biology at Stanford University School of Medicine. Joining Dr. Wilcox and Dr. Fornberg on the Board of Directors is Dr. Phillip Frost, Dr. Sam Lee, Steven Rubin and Dr. Jane Hsiao. Dr. Frost is currently the Chairman and CEO of Opko Health, Inc, and the Chairman of the Board of Teva Pharmaceuticals. Dr. Hsiao is Vice Chairman and Chief Technical Officer of Opko Health, Inc.

Newly Appointed CEO and Chairman, Dr. Gary Wilcox commented, "We are keenly focused on bringing our small molecule inhibitors of the viral replication complex to market. We believe in our ability to discover oral, once-a-day, broad-spectrum antiviral drug candidates targeting the polymerase enzyme of the Hepatitis C virus. This merger provides us even greater resources to help bring products to market and offers our shareholders an opportunity to realize significant value on their investment."

Member of the Board of Directors Dr. Frost commented, "We are excited about the team we have assembled with Dr. Wilcox's top-notch pedigree and successes in bringing products to market; I am confident in the future of this company. There are many compelling advantages to the technologies for small molecule inhibitors of the viral replication complex."

Cocrystal Discovery has five therapeutic programs targeting the Hepatitis C Virus (HCV), Influenza, the Human Rhinovirus (HRV), Dengue, and the Norovirus. The Hepatitis C Virus is the cause of 170 million chronic infections worldwide and has created a market for the treatment of $6 billion in 2012 that is projected to grow to $20 billion by 2020. Cocrystal Discovery is targeting two Hepatitis C replication enzymes, with its Polymerase program at lead optimization stage and its Helicase program at lead identification stage. Cocrystal Discovery's Influenza, HRV, Dengue, and Norovius programs are targeting unmet multi-billion dollar market opportunities with first-in-class antivirals.

Under the terms of the merger agreement, current shareholders of BioZone Pharmaceuticals and Cocrystal Discovery will own approximately 40% and 60% of the combined company, respectively. The company plans to apply for a name change and ticker change in the

upcoming months to more accurately reflect its business moving forward.

48.    On April 15, 2014, the company Cocrystal Pharma, Inc. was formed and announced the new ticker symbol of "COCP" from "BZNE" which was trading on the OTC Markets.

49.    On March 31, 2014, the Company filed a Form 10-K for the year ended December 31, 2013 (the "2013 10-K") with the SEC, which provided the Company's full year 2013 financial results and position. The 2013 10-K was signed by Defendants Wilcox, McGuire, and Frost. The 2013 10-K contained signed SOX certifications by Defendants Wilcox and McGuire, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

50.    On April 4, 2014, the Company, filed a Form 10-K/A for the year ended December 31, 2013 (the "2013 10-K/A") with the SEC, which provided the Company's full year 2013 financial results and position. The 2013 10-K/A was signed by Defendants Wilcox, McGuire, and Frost. The 2013 10-K/A contained signed SOX certifications by Defendants Wilcox and McGuire attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

51.    On March 31, 2015, the Company filed a Form 10-K for the year ended December 31, 2014 (the "2014 10-K") with the SEC, which provided the Company's

full year 2014 financial results and position. The 2014 10-K was signed by Defendants Wilcox, McGuire, and Frost. The 2014 10-K contained signed SOX certifications by Defendants Wilcox and McGuire attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

52.     On March 15, 2016, the Company filed a Form 10-K for the year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided the Company's full year 2015 financial results and position. The 2015 10-K was signed by Defendants Meckler, Wilcox, Dale, and Frost. The 2015 10-K contained signed SOX certifications by Defendants Meckler and Dale attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

53.     On March 31, 2017, the Company filed a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's full year 2016 financial results and position. The 2016 10-K was signed by Defendants Wilcox, Martin, and Frost. The 2016 10-K contained signed SOX certifications by Defendants Wilcox and Martin attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

54.     On March 21, 2018, the Company filed a Form 10-K for the year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's full year 2017 financial results and position. The 2017 10-K was signed by Defendants Wilcox, Martin, and Frost. The 2017 10-K contained signed SOX certifications by Defendants Wilcox and Martin attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

55.     The statements referenced in ¶¶38-54 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants were engaged in a pump-and-dump scheme to artificially inflate the Company's stock price; (2) this illicit scheme would result in governmental scrutiny, including from the SEC; (3) Defendants failed to abide by SEC disclosure regulations; and (4) as a result, Defendants' statements about Cocrystal's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

56.    On September 7, 2018, the SEC issued a press release entitled "SEC

Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes"

which included Frost as a defendant. The SEC made its complaint against Frost, and

others available on its website at https://www.sec.gov/news/press-release/2018-182.

The press release states, in relevant part:

> Washington D.C., Sept. 7, 2018 —The Securities and Exchange
> Commission today charged a group of 10 individuals and 10 associated
> entities for their participation in long-running fraudulent schemes that
> generated over $27 million from unlawful stock sales and caused
> significant harm to retail investors who were left holding virtually
> worthless stock.
>
> According to the SEC's complaint, from 2013 to 2018, a group of
> prolific South Florida-based microcap fraudsters led by Barry Honig
> manipulated the share price of the stock of three companies in classic
> pump-and-dump schemes. ***Miami biotech billionaire Phillip Frost
> allegedly participated in two of these three schemes***. Honig allegedly
> orchestrated the acquisition of large quantities of the issuer's stock at
> steep discounts, and after securing a substantial ownership interest in
> the companies, ***Honig and his associates engaged in illegal
> promotional activity and manipulative trading to artificially boost
> each issuer's stock price and to give the stock the appearance of active
> trading volume. According to the SEC's complaint, Honig and his
> associates then dumped their shares into the inflated market, reaping
> millions of dollars at the expense of unsuspecting investors.***
>
> "As alleged, Honig and his associates engaged in brazen market
> manipulation that advanced their financial interests while fleecing
> innocent investors and undermining the integrity of our securities
> markets," said Sanjay Wadhwa, Senior Associate Director in the SEC's
> Division of Enforcement. "They failed to appreciate, however, the
> SEC's resolve to relentlessly pursue and punish participants in
> microcap fraud schemes."

> *The SEC's complaint, which was filed in federal district court in Manhattan, charges Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark Groussman, Frost, Elliot Maza, Robert Ladd, Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., OPKO Health Inc., Frost Gamma Investments Trust, Southern Biotech Inc., and Stetson Capital Investments Inc. with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief.*

(Emphasis added).

57.     On this news, shares of Cocrystal fell $0.58, or over 15.5%, over the next two trading days to close at $3.16 on September 11, 2018, damaging investors.

58.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Cocrystal and/or BioZone during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs,

successors or assigns and any entity in which Defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ or OTC. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

65.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ or OTC, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

24

Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)  Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

66.  Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

67.  Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

68.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

70.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

72.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such

statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

73.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

74.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity

of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

75.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

76.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

77.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 9(a) and (f) of the Exchange Act
### Against the Scheme Defendants

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     During the Class Period, the Scheme Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (2) engaged in a scheme to inflate the price of Cocrystal's securities; and (3) mislead and caused Plaintiff and other members of the Class to purchase Cocrystal's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

80.     The Scheme Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Cocrystal's securities in an effort to maintain artificially high market prices for Cocrystal's securities in violation of Sections 9(a) and 9(f) of the Exchange Act. The Scheme Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

29

81.    By virtue of the foregoing, the Scheme Defendants made statements which were at the time and in the light of the circumstances under which they were made, false or misleading with respect to the value of Cocrystal securities which Defendants knew or had reasonable ground to believe were so false or misleading.

82.    The Scheme Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make said false or misleading statements with respect to the value of Cocrystal securities which Defendants knew or had reasonable grounds to believe were so false or misleading.

83.    Each of the Scheme Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Scheme Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Scheme Defendants, by virtue of his responsibilities and activities as a senior officer, and/or director of the Company, and/or agent of the Company was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Scheme Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances,

operations, and sales at all relevant times; and (4) each of these Scheme Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

84.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Cocrystal's true value and the Scheme Defendants' price manipulation, which was not disclosed by the Scheme Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Cocrystal securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

85.     By virtue of the foregoing, the Scheme Defendants violated Section 9(a) and 9(f) of the Exchange Act, 15 U.S.C. § 78i(a) and 78i(f).

86.     As a direct and proximate result of Count II Defendants' conduct as described herein, Plaintiff has suffered significant damages and is entitled to such damages from Count II Defendants, jointly and severally.

87.     This action was filed within one year of discovery of the fraud and within three years of Plaintiff's purchases of securities giving rise to the cause of action.

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### Against the Officer Defendants

88.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.     During the Class Period, the Officer Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

90.     As officers and/or directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

91.     Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Officer Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Officer Defendants therefore, were

"controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

92.    Each of the Officer Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Officer Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Officer Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

93.    By reason of the above conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **COUNT IV**

**Violation of Section 20(b) of the Exchange Act Against Honig, Brauser, Frost, O'Rourke, Stetson, Groussman, and Keller**

94.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

33

95.     By their conduct as alleged above, Count IV Defendants directly and indirectly, acted through and used another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

96.     In acting through and using another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Count IV Defendants acted intentionally, knowingly or with severe recklessness with respect to the truth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

34

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 20, 2018                    Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             By: /s/Laurence M. Rosen
                                             Laurence M. Rosen
                                             609 W. South Orange Avenue, Suite 2P
                                             South Orange, NJ 07079
                                             Tel: (973) 313-1887
                                             Fax: (973) 833-0399
                                             Email: lrosen@rosenlegal.com

                                             *Counsel for Plaintiff*

35