**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTHONY PEPE, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>COCRYSTAL PHARMA, INC. F/K/A BIOZONE PHARMACEUTICALS, INC., ELLIOT MAZA, GARY WILCOX, JEFFREY MECKLER, GERALD MCGUIRE, JAMES MARTIN, CURTIS DALE, PHILLIP FROST, BARRY C. HONIG, JOHN STETSON, MICHAEL BRAUSER, JOHN O'ROURKE III, MARK GROUSSMAN, BRIAN KELLER, AND JOHN H. FORD,<br><br>    Defendants. | Case No. 2:18-cv-14091-KM-JBC<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Andrew Logie and named Plaintiffs Anthony Pepe and Scot Scruta ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint

against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Cocrystal Pharma, Inc. f/k/a/ BioZone Pharmaceuticals, Inc. ("Cocrystal" or the "Company")[1], press releases and public statements by the Company, media and analyst reports about the Company, and publicly available information from other legal actions factually related to this action, including (i) *SEC v. Honig*, No. 18-cv-8175-ER (S.D.N.Y.); (ii) *In re Opko Health, Inc. Sec. Litig.*, No. 18-cv-23786-JEM (S.D. Fla.); (iii) *Fisher v. BioZone Pharm., Inc.*, No. 12-cv-3716 (N.D. Cal.); (iv) *In re Opko Health, Inc. Derivative Action*, No. 2018-740-SG (Del. Ch.). Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class of investors who purchased Cocrystal and/or BioZone securities from September 23, 2013 through September 7, 2018, both dates inclusive ("Class Period"), seeking to recover

---

[1]  "Cocrystal" or the "Company" are used herein to include BioZone Pharmaceuticals, Inc. ("BioZone") unless otherwise indicated.

damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     BioZone investors were defrauded by a group of serial stock promoters who engaged in a classic pump-and-dump scheme. In this scheme, the Scheme Defendants (defined below) took control of Biozone, bought extremely cheap BioZone shares, artificially increased the price and apparent trading volume of BioZone stock, then sold their shares for millions in profits.

3.     First, some of the Scheme Defendants purchased shares and took control of a public shell company. They then convinced the management of BioZone, a small, private biotech company with promising, but undeveloped product ideas, to undergo a reverse merger with their shell company in exchange for millions of dollars in research and development funding. The Scheme Defendants never delivered on their funding promises, but they ensured that the BioZone insiders who capitulated and helped consummate the reverse merger were handsomely compensated.

4.     The Scheme Defendants continued to amass BioZone shares at minimal prices, controlling the Company through their hand-picked CEO and Board. The Scheme Defendants operated as a unified group, but never disclosed their substantial stock holdings or control over the Company to BioZone investors.

5.      In September 2013, some of the Scheme Defendants contacted a stock promoter they had a preexisting relationship with. They offered the promoter shares of BioZone at below-market prices in exchange for the promoter writing and publishing a bullish article about BioZone on *Seeking Alpha*. The Scheme Defendants provided the promoter with the article's title and its major points and directed the promoter to issue the article. The article was false and misleading as it was presented to investors as independent analysis, when in reality it was a paid article produced by the Scheme Defendants.

6.      Just before the promoter published his article, the Scheme Defendants engaged in a series of coordinated trades of BioZone stock to create the false appearance of market demand. These trades made the market appear to have rising prices and active trading volume—neither of which existed prior to their efforts—priming the market for the paid promotional article.

7.      The plan worked and the price of BioZone stock soared. The Scheme Defendants took advantage, selling off over $9 million in BioZone shares over the next few months, staggering their sales to avoid drawing scrutiny.

8.      Once the "dump" was complete, the Scheme Defendants caused the Company to sell off substantially all of its assets to MusclePharm Corporation ("MusclePharm"), which was controlled by the same Scheme Defendants, at a steep discount. The Company never disclosed this material transaction as a related party

4

transaction in its periodic reports filed with the SEC during the Class Period, which rendered them false and misleading. The Company was required to disclose such related party transactions under Generally Accepted Accounting Principles ("GAAP") and SEC Rules because MusclePharm was an affiliate of BioZone. MusclePharm was an affiliate of BioZone because the same group of shareholders – the Scheme Defendants – controlled both companies.

9.      Finally, the Scheme Defendants used BioZone as an empty public shell to execute yet another reverse merger with another private biotech company, Cocrystal Discovery Inc. ("Old Cocrystal"), forming the post-merger Cocrystal. Unsurprisingly, some of the Scheme Defendants held substantial interests in Old Cocrystal as well.

10.     After extensive investigation, the SEC finally caught up with the pump-and-dump scheme. In September 2018, the SEC filed a complaint against the Scheme Defendants, and others, alleging detailed facts outlining the BioZone scheme as well as two similar pump-and-dump schemes orchestrated by many of the same Scheme Defendants.

11.     Many of the Scheme Defendants have already settled the SEC's charges, agreeing to millions of dollars in fines and restitution and agreeing to be banned from various forms of involvement with penny stocks and public companies.

12.     When the SEC's allegations were published and Cocrystal was quickly identified as "Company A" in the SEC's complaint, Cocrystal's stock plummeted over 15.5%, damaging investors.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 9(a) and (f), 10(b), 20(a), and 20(b) of the Exchange Act (15 U.S.C. §§ 78i(a), 78i(f), 78j(b), 78t(a), 78t(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as Defendants conducts business in this district and a significant portion of the Defendants' actions and the subsequent damages took place within this District.

16.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

17.     Lead Plaintiff Andrew Logie, as set forth in his certification on file with the Court and incorporated by reference herein, acquired Cocrystal securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.     Named Plaintiff Anthony Pepe, as set forth in his certification on file with the Court and incorporated by reference herein, acquired Cocrystal securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.     Named Plaintiff Scot Scruta, as set forth in his accompanying PSLRA Certification, acquired Cocrystal securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.[2]

20.     Defendant Cocrystal is a clinical stage biotechnology company incorporated in Delaware. Cocrystal securities trade on NASDAQ under the symbol "COCP." Cocrystal securities began trading on NASDAQ on March 12, 2018, as they previously traded on the OTC. There was a 1-for-30 reverse stock split on January 24, 2018. During the time period from January 24, 2018 through the following 20 business days the Company's stock ticker was "COCPD," but

---

[2] Scruta's certification is attached hereto as Exhibit 1.

thereafter resumed trading under the ticker "COCP." Cocrystal was the product of 2014 reverse merger of Cocrystal Discovery Inc., a private company, and BioZone, which at that time was merely a public shell company.

21.    BioZone was a private biotech company headquartered in Englewood Cliffs, New Jersey. BioZone was in the business of manufacturing over-the-counter pharmaceutical products. BioZone entered into a reverse merger with a public shell company in 2011, and traded thereafter under the ticker "BZNE" until merging with Cocrystal.

22.    Defendant Elliot Maza served as the CEO, CFO, and Secretary of the Company, and sat on the Company's board of directors, from May 2011 to January 2014.[3] Maza was also a shareholder of BioZone.

23.    Defendant Gary Wilcox served as the CEO of Old Cocrystal and post-merger Cocrystal from 2008 until March 2015, served as Interim CEO of Cocrystal from July 2016 through January 2019, and has served again as permanent CEO of Cocrystal since January 2019. Wilcox has been a member of the board of directors of the Company since the merger with BioZone in January 2014. Wilcox served as Chairman of the board for Cocrystal from January 2014 through March 2015, and from February 2019 through the present.

---

[3] Maza was named Interim CEO, CFO, and Secretary of BioZone on May 16, 2011, and then as permanent CEO on August 2, 2011.

8

24.     Defendant Jeffrey Meckler was the Company's CEO from October 2015 to July 2016. Meckler served as Interim CEO from March 2015 until October 2015.

25.     Defendant Gerald McGuire was the Company's CFO and Treasurer from January 2014 until November 2015.

26.     Defendant James Martin has been the Company's CFO since June 2017. Martin served as the Company's Interim CFO from February 2017 until June 2017.

27.     Defendant Curtis Dale was the Company's CFO from November 2015 until January 2017.

28.     Defendant Phillip Frost has been a director and a principal shareholder of the Company since before the beginning of the Class Period. Frost is also the Chairman, CEO, and largest shareholder of Opko Health, Inc. ("Opko"). Prior to becoming CEO of Opko, Frost was the Chairman and CEO of IVAX Corporation ("Ivax"), which he sold to Teva Pharmaceuticals ("Teva") in 2005 for $7.6 billion. Following the Ivax sale, Frost served as Vice Chairman, and later Chairman, of Teva. Frost is also the trustee for Frost Gamma Investment Trust ("FGIT"), which is chiefly an investment vehicle for Frost.

29.     Defendant Barry C. Honig was a shareholder of BioZone. Honig has been described as a serial stock promoter with documented ties to multiple illicit

"pump-and-dump" or stock promotion schemes. Honig also owns a majority stake in HS Contrarian Investments ("HSCI"). Honig was also the president and one-third owner of Southern Biotech, Inc. ("Southern Biotech").

30.     Defendant John Stetson was a shareholder of BioZone. Stetson owns and operates Stetson Capital Investments Inc. ("SCI") and has a minority investment in HSCI, of which he is the named managing member.

31.     Defendant SCI, under the direction and control of Stetson, purchased and sold shares of BioZone in the pump-and-dump scheme, as alleged below.

32.     Defendant Michael Brauser was a shareholder of BioZone. Brauser owns and operates Grander Holdings, Inc. ("Grander"), and owned one third of Southern Biotech.

33.     Defendant Grander, under the direction and control of Brauser, purchased and sold shares of BioZone in the pump-and-dump scheme, as alleged below.

34.     Defendant John O'Rourke III was a shareholder of BioZone. O'Rourke owns and operates ATG Capital LLC ("ATG").

35.     Defendant ATG, under the direction and control of O'Rourke, purchased and sold shares of BioZone in the pump-and-dump scheme, as alleged below.

36.     Defendant Mark Groussman was a shareholder of BioZone. Groussman owns and operates Melechdavid, Inc. ("Melechdavid").

37.     Defendant Melechdavid, under the direction and control of Groussman, purchased and sold shares of BioZone in the pump-and-dump scheme, as alleged below.

38.     Defendant Brian Keller was the President and Chief Scientific Officer of BioZone, a director of the Company's board, and a shareholder of BioZone. Keller currently works as President of Sales and Senior Vice President of Research and Development at Cocrystal.

39.     Defendant John H. Ford was a stock promoter who was retained to write favorable articles about BioZone on the *Seeking Alpha* website in exchange for undisclosed stock compensation.

40.     Maza, Wilcox, Meckler, McGuire, Martin and Dale are herein referred to as the "Officer Defendants."

41.     Frost, Maza, Honig, Stetson, Brauser, O'Rourke, Groussman, Keller, Ford, SCI, Grander, ATG, and Melechdavid are herein referred to as the "Scheme Defendants."

42.     Maza, Wilcox, Meckler, McGuire, Martin, Dale, Frost, Honig, Stetson, Brauser, O'Rourke, Groussman, Keller, and Ford are herein referred to as "Individual Defendants."

11

43.     Collectively, Cocrystal and Individual Defendants are herein referred to as "Defendants."

44.     Each of the Officer Defendants:

a.     directly participated in the management of the Company;

b.     was directly involved in the day-to-day operations of the Company at the highest levels;

c.     was privy to confidential proprietary information concerning the Company and its business and operations;

d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.     approved or ratified these statements in violation of the federal securities laws.

45.     Cocrystal is liable for the acts of the Officer Defendants and its employees under the doctrine of *respondeat superior* and common law principles of

agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

46.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Cocrystal under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### The Scheme Defendants Engage in a Classic Pump-and-Dump Scheme

**The Scheme Defendants Buy a Public Shell Company**

47.     In November 2010, Honig, Stetson, and Groussman together purchased one-third of a publicly-traded shell company, International Surf Resorts, Inc. ("ISRI"). In December 2010, Frost and Brauser each purchased half of the remaining two-thirds of ISRI not owned by Honig, Stetson, and Groussman.

48.     Honig, Stetson, Groussman, Frost, and Brauser disguised their roles in the purchase of the shell company by purchasing shares through an intermediate entity that owned a majority of ISRI's shares. ISRI disclosed only the ownership interest of the intermediary in its public filings, allowing Honig, Stetson, Groussman, Frost and Brauser to conceal their ownership interests.

49.     With complete control over the company, the ownership group then installed Roberto Prego-Novo as the sole director of ISRI. Prego-Novo had

previously worked with Frost at Ivax, Teva, and Aero Pharmaceuticals, Inc. ("Aero").

**The Scheme Defendants Convince BioZone to Enter into a Reverse Merger**

50.    After completing their takeover of ISRI, Honig, Brauser, and Frost approached the management of BioZone, then a private biotech company, to discuss a proposal to take BioZone public through a reverse merger with ISRI. The BioZone representatives they approached included BioZone's CEO, Daniel Fisher, and its Chief Scientific Officer and director, Keller.

51.    Reverse mergers have long been considered suspect when used to take a company public. Regulators such as the SEC and FINRA have warned that reverse mergers lack the level of scrutiny or transparency that help guard against fraud and abuse in traditional methods of accessing public markets. For example, in 2011, SEC Commissioner Luis A. Aguilar cautioned that:

> A common but lesser known way of accessing the public markets is the reverse merger into a public shell, or where a public shell merges into a private company, a so-called "backdoor registration." For those of you not familiar with these types of mergers, what typically happens is a private company seeking to go public merges with a public shell company. Before the transaction, the public shell company no longer has substantive operations, but its public company registration remains in effect. The [reverse merger] transaction gives the formerly private company the credibility and access to capital of being registered as a public company, without any of the vetting from underwriters and investors that companies undergo when they perform a traditional IPO.

52.     BioZone management believed that the reverse merger would allow BioZone to access capital to fund research and development, including of its "QuSomes" drug delivery technology. BioZone hoped to use QuSomes in large-scale drug markets but lacked sufficient funding to develop the technology.

53.     Frost, Honig, and Brauser told BioZone's management that they would raise between $8-15 million for QuSomes-related research and development through the reverse merger, including contributions from Frost, Honig, and Brauser. They also promised to provide Fisher, Maza, and one BioZone research scientist each with 6.65 million shares of the post-merger company, securing their approval for the deal.

54.     In January 2011, The Frost Group, a private-equity group including Frost, Brauser, and Honig, sent BioZone a binding letter of intent memorializing The Frost Group's intent to invest in BioZone and provide funding for BioZone's research and development. The letter was on letterhead from the "Honig, Brauser, Frost Group."

55.     In February 2011, Keller organized multiple meetings with Frost, Keller, Honig, Maza, and Prego-Novo, among others. Frost, Honig, Brauser and their associates promised at those meetings to contribute $8-15 million in funding to BioZone's research and development efforts, but they never delivered.

15

56.    According to Fisher, who filed his own lawsuit against the Company, Frost, Honig, Brauser, Maza, Keller, and others, Frost "insisted" that BioZone use Maza as its lawyer through the reverse merger process with ISRI.

57.    BioZone and ISRI entered into a securities purchase agreement to effectuate the reverse merger on February 28, 2011. At the same time, Frost, Honig and Brauser caused ISRI to purchase certain unprofitable assets held by Frost, such as Aero, in exchange for shares of BioZone stock.

58.    According to BioZone's Form 10-K/A filed on September 12, 2013, Frost beneficially owned 46% of Aero's outstanding stock. Prego-Novo beneficially owned 23% of Aero's outstanding stock. The Form 10-K/A also disclosed that after BioZone acquired Aero, "[e]ach of Dr. Frost and Mr. Prego-Novo beneficially owned approximately 10.63% and 4.62%, respectively" of BioZone, and that "Dr. Frost acquired a portion of his shares in February and March, 2011 for approximately $0.027 per share, while the remainder of his shares were acquired through the cashless exercise of warrants." This way, Frost was able to acquire additional BioZone shares extremely cheaply.

59.    In March 2011, a bank that had issued BioZone a $3 million line of credit refused to approve the ISRI-BioZone transaction, and refused to provide the $2 million bridge financing needed to pay for the reverse merger. As a condition of the line of credit, the bank had authority to approve all major BioZone transactions.

16

Specifically, the bank stated its concerns that "[t]he proposed acquisition creates enormous conflicts of interest. There is substantial reason to believe that the resulting entity would act for the benefit of [the investor group] as a whole, rather than the interests of [BioZone]."

60.     Undeterred, Frost, Honig, and their team pushed forward with the merger, which eventually closed in June 2011. The bank sent a default notice, making the full amount owing under the line of credit immediately due and payable.

**The Scheme Defendants Control BioZone and Continue to Buy Cheap Shares**

61.     As a result of the merger, not only did Honig, Brauser, Frost, Stetson, and Groussman together control the vast majority of BioZone's outstanding shares, they also exercised control over BioZone's management. Honig and Brauser took the lead in actively controlling the Company and its management, but they acted with the knowledge and consent, and for the benefit, of their co-investors as a group: Frost, Stetson, Groussman, and the other Scheme Defendants.

62.     Honig and Brauser installed Maza as CEO and CFO of BioZone, and Prego-Novo as Chairman. Honig and Brauser also installed Maza and Keller as BioZone's two other board members following the reverse merger. The new BioZone board, under Honig and Brauser's control, appointed Keller as President and Chief Science Officer.

63.     During his tenure as CEO of BioZone, Maza took orders from Honig and Brauser and sought their approval for BioZone's business decisions. According to the SEC, "[t]hereafter, Maza sought approval from Honig, Brauser, and sometimes [Frost] for material business decisions," including "agree[ing] to divert funds from [BioZone] to pay rent for the office of an unrelated entity" at the same exact location of Opko's offices, owned by Frost through Frost Real Estate Holdings, LLC, the same Miami location where a number of other Frost- and Honig-related entities maintained offices. After the merger, BioZone also listed its corporate address as the same Miami address.

64.     One of Maza's first orders of business as CEO was to cause BioZone to pay off the objecting bank's line of credit on September 8, 2011, removing the bank as an obstacle to BioZone's reverse merger arrangements with ISRI. In order to finance paying off the bank, BioZone incurred substantial loans from Frost in the form of high-interest short-term convertible debt.

65.     The SEC also noted that "Maza ... sent Honig, Brauser and [Frost] updates at least every month providing details on business operations and business opportunities, as well as seeking their approval for material business decisions." In one such instance, on February 28, 2013, Maza emailed Brauser that Honig and Frost had approved proposals from two lenders, asking "[Frost] is OK if you're OK with it. Work for u?" According to the SEC, Keller stated in a February 12, 2012 email

18

that "[t]he real power is with Barry Honig and Mike Brauser. Elliot [Maza] is just a mouth piece."

66.     Following the reverse merger with ISRI, BioZone's filings with the SEC failed to identify Honig, Brauser, or the group of Frost, Honig, Brauser, Stetson, and Groussman, as owning greater than a 5% interest in BioZone, as required under the securities laws. Maza and Keller each signed BioZone's public filings, in which they knowingly failed to disclose the share ownership of the controlling shareholder group.

67.     In December 2011, Fisher filed a whistleblower complaint with the SEC. Fisher alleged that Frost, Honig, Brauser, and related entities and individuals had violated securities laws and breached their stock-purchase agreement executed in connection with the merger. Fisher was due to receive 6.65 million BioZone shares under that agreement.

68.     Maza fired Fisher in January 2012. On November 22, 2012, Fisher sued BioZone, Frost, Honig, Brauser, Maza, and others in a case styled *Fisher v. BioZone Pharm., Inc.*, No. 12-cv-3716 (N.D. Cal.). Fisher alleged, among other things, fraud, and violations of securities laws, RICO, and Dodd-Frank.

69.     In September 2013, after the defendants' motion to dismiss was denied, the parties settled the dispute, paying Fisher $2 million. Brauser, who was not an officer or director of BioZone, lead the settlement negotiations on behalf of BioZone,

frequently updating Honig on his negotiations and soliciting Honig's input. Maza ratified the terms of the settlement on September 5, 2013.

70.     Despite the assurances that Frost, Honig, Brauser and others provided to BioZone's management leading up to the merger, the new controlling ownership group did not invest additional funds into BioZone's research and development efforts. Instead they provided a minimal influx of capital through a series of private investment in public equity ("PIPE") financings between March 2011 and June 2012 on favorable terms for themselves, including debt securities convertible at pennies per share into millions of BioZone shares and warrants providing the controlling shareholders with even more BioZone shares at extremely low prices.

71.     Honig and Brauser used the PIPE financings to amass even more cheap BioZone shares for themselves and their associates. Maza and Keller cooperated with Honig and Brauser's efforts even though the financings did nothing to help BioZone's continued growth. Maza and Keller went along with Honig, Brauser, and Frost's control because they were promised, and ultimately rewarded with, substantial salaries and millions of BioZone shares. In exchange for their complicity, Maza and Keller each received millions of shares of BioZone stock over the course of their tenures with the Company.

72.     The controlling shareholder group ensured that those funds were used to pay the minimal amount necessary to keep BioZone's business operating and to

fund the outsized compensation they had granted to Maza and Keller. According to BioZone's public filings, Maza's six-figure compensation doubled from 2011 to 2012, and Keller's six-figure compensation rose 129% from 2011 to 2013. At the same time, BioZone's research and development funding ran dry, forcing BioZone to cease its research and development activities by mid-2012.

73.   Keller, Maza, and Prego-Novo concealed the Frost-Honig-Brauser group's control of BioZone by signing public filings for the Company that failed to disclose the group's involvement, including BioZone's Form 10-K filed on April 16, 2012. Keller and Maza knew that Honig and Brauser, with the knowledge and consent of the other Scheme Defendants, controlled BioZone's management. Yet BioZone's filings identified only Frost as a control person and not Honig and Brauser, or the Scheme Defendants' collective investment group.

74.   By April 1, 2013, Honig, Frost, Brauser, Maza, Keller, Stetson, and Prego-Novo, together with the investment vehicles they controlled, had amassed over 44 million BioZone shares, equaling nearly 71% of BioZone's outstanding shares. Yet BioZone still did not disclose the group's combined ownership.

75.   On August 30, 2013, in a Form 8-K filed with the SEC, BioZone disclosed that it had entered into a securities purchase agreement with MusclePharm. Frost was a large investor in MusclePharm, which invested $2 million in BioZone in exchange for a 10% secured note convertible into shares of BioZone common

21

stock for $0.20 per share and a ten-year warrant to purchase 10 million BioZone shares for $0.40 per share. The terms of this deal were highly favorable to MusclePharm, at BioZone's expense. In this manner, Frost quietly acquired beneficial ownership of even more shares of BioZone at bargain basement prices.

76.     Beginning in August and September 2013, Stetson, at Honig's direction, deposited almost 4 million shares of BioZone that had been issued to Honig in a brokerage account. In the broker's questionnaire which Honig signed and Stetson submitted along with the deposit of these shares, Honig falsely denied any relationship between Honig, BioZone, or its affiliates.

77.     On September 4-6, 2013, Stetson aided in obtaining the issuance of a false attorney opinion letter to BioZone's transfer agent in order to remove restrictive legends from Honig's share certifications. These opinion letters falsely stated that Honig was not an affiliate of BioZone, which Stetson knew was false.

78.     To aid in depositing Honig's shares with a broker, Maza was also required to issue a representation letter to confirm the authenticity of the stock certificates, which he did. The letter falsely stated that "there is no other agreement or understanding between Barry Honig and [BioZone] that would preclude Barry Honig from selling or otherwise disposing of shares represented above." Honig was an affiliate of BioZone, and therefore his ability to sell BioZone shares was subject to volume limitations under the federal securities laws. In September 2013, the

22

restrictions on Honig's shares were removed, and the shares were deposited into a brokerage account, ready to be sold.

**The Scheme Defendants Pump and Dump BioZone Stock**

79.    As the SEC noted, in mid-September 2013 BioZone's stock had minimal trading volume, and "the market for [BioZone shares] was virtually nonexistent (with zero volume on September 20, 2013)."

80.    In September 2013, Honig reached out to O'Rourke. O'Rourke shared office space with Honig and served as the CEO of Riot Blockchain. Honig was the largest shareholder of Riot Blockchain at the time. Honig achieved great notoriety for his pump-and-dump scheme involving Venaxis, Inc, where he and O'Rourke pumped up the price of Venaxis stock by renaming the company "Riot Blockchain" amidst the late-2017 cryptocurrency bubble, before selling off their shares.

81.    Honig directed O'Rourke to reach out to Ford, a stock promoter who regularly provided investment analysis on the website *Seeking Alpha*, and had a preexisting relationship with Honig. On Honig's instructions, O'Rourke asked Ford to write an article on *Seeking Alpha* promoting BioZone in exchange for below-market price BioZone shares. O'Rourke complied, instructing Ford to write a favorable article about BioZone emphasizing Frost's involvement. Frost was a well-known billionaire and successful biotech investor whose involvement in a company was known to drive up interest in that company's stock. O'Rourke also directed Ford

to focus on the purportedly promising prospects of BioZone's research and development department.

82.    On September 23, 2013, Honig and his associates began trading BioZone securities to create the false appearance of market activity in advance of Ford's article. Thanks to their surreptitious trading, BioZone trading volume jumped from zero the previous trading day to 302,000.

83.    Also on September 23, 2013, Honig arranged payment to Ford for the upcoming article. O'Rourke called Ford and told him to place buy orders for BioZone at $0.40 and made sure it was executed against a corresponding sale placed by Honig. Honig sold 180,000 shares to Ford at the coordinated rate of $0.40, significantly below the price of BioZone stock on that day.

84.    Further on September 23, 2013, O'Rourke, through his investment vehicle ATG, put in the last BioZone trade of the day, purchasing shares from another Honig associate just before the close of trading at $0.68, which was significantly higher than the $0.55 price at which BioZone was trading just prior to O'Rourke's trade. This created the false impression that the stock price was increasing as the market closed, a practice known as "marking the close."

85.    On September 26, 2013, Honig and his associates engaged in coordinated trades to enhance the false impression of an active market for BioZone securities. For instance, a charitable foundation controlled by Honig sold BioZone

shares to another Honig associate at $0.68 per share, and two minutes later another Honig-affiliated entity executed a transaction against ATG, O'Rourke's investment vehicle, also at $0.68 per share.

86.     That same day, less than a half hour before market close, Ford's published his article on *Seeking Alpha*. The article, titled "Opko and Its Billionaire CEO Invested in BioZone"—a title Honig and O'Rourke supplied to Ford—touted BioZone, concluding that it "should be trading for more than twice today's valuation." Ford's article emphasized Frost's investment in BioZone and his reputation as a successful biotech investor. For example, the article included a passage reading:

> I recently established a position in BioZone Pharmaceuticals based on the company's undervaluation, its patented QuSomes technology, and the fact that Opko and Dr. Phillip Frost have taken a 25% position in BioZone. (All of my Dr. Frost investments have provided large returns.)

87.     Ford's article also states that some of the "key points" concerning his research into BioZone include:

> Dr. Phillip Frost and his company, Opko, have purchased 17.68 million shares of BioZone stock (about 25% of the company). In my opinion they would not have taken such a large position unless BioZone's QuSomes technology was solid. I feel confident in my due diligence, but Dr. Frost and his scientific team are capable of a much higher level of scientific analysis than I could ever conduct. His large position in BioZone is a strong validation of the company's technology. ...
>
> With Opko and Dr. Frost's investment in the company, I assume Dr. Frost is offering his experience and expertise in guiding the company's

25

development. Given his track record, this can only benefit shareholders and is one of the primary reasons I invested in BioZone.

88.    Keller reviewed Ford's article before it was published, and the article also contained a question-and-answer interview with Keller, which O'Rourke had arranged earlier that month, touting the benefits of QuSomes. Keller pointed to Frost's involvement and the further development of the QuSomes technology as part of BioZone's growth plan. In response a question on taking on a partner, Keller stated that "[i]t will certainly be something we discuss with Dr. Frost."

89.    The article also misleadingly stated that BioZone had a formulation ready to be tested and brought to the billion-dollar injectable drug market. Specifically, Ford asked Keller if BioZone had "any other product candidates" in its pipeline. Keller pointed to the Company's supposed development of an injectable version of an antifungal drug, Posaconazole, for which Biozone could "capture a large percentage of the $4 billion injectable antifungal market." Keller also boasted that the Company "ha[s] already developed a formulation" for the drug.

90.    These statements were false and misleading because Keller knew that BioZone had shut down all of its research and development department without having successfully formulated the injectable drug, and BioZone had stopped all attempts at developing this technology over one year prior to his statements.

91.    Ford's *Seeking Alpha* article did not disclose that he was compensated by Honig to write the article. In fact, Ford stated the opposite: "I wrote this article

myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article." These statements were false and misleading because they failed to disclose that (1) Ford had been compensated by Honig to write and publish the article, by means of below-market BioZone shares; (2) Keller had reviewed the article prior to it being published; and (3) Honig and O'Rourke had directed Ford on the substance of the article, such as playing up Frost's involvement, and even supplied the title of the article.

92.     Honig, O'Rourke, and Keller, acting on behalf of the Scheme Defendants and the Company to artificially inflate the price and trading volume of BioZone stock, had ultimate authority over the Ford article, including its content and whether and how to communicate it.

93.     Ford's *Seeking Alpha* article worked exactly as planned. Trading volume in BioZone exploded from about 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013, and to more than 6 million shares on October 2, 2013. The share price, which averaged approximately $0.48 in August 2013, shot up to $0.97 on October 17, 2013.

94.     As the controlling shareholder group had acquired their shares so cheaply, they did not need to sell their shares immediately following the stock price increase after Ford's article. Instead, they staggered their sales over a three-month

period, allowing them to avoid depressing the stock price and avoiding potential scrutiny over massive simultaneous selling.

95.     Between September 26, 2013 and December 27, 2013, Honig, Brauser, Frost, Groussman, Stetson, O'Rourke, Grander, Melechdavid, SCI, and ATG sold over 15.7 million shares of BioZone and received proceeds of over $9.2 million. Frost sold nearly 2 million BioZone shares between October 1-4, 2013, for proceeds of over $1 million. Honig sold nearly 6 million BioZone shares between September 23, 2013 and December 16, 2013, for proceeds of over $3.4 million. Brauser and his investment vehicle, Grander, sold over 2 million BioZone shares between September 27, 2013 and December 23, 2013, for proceeds of over $1.2 million. Groussman and his investment vehicle, Melechdavid, sold over 1.2 million BioZone shares between September 26, 2013 and October 14, 2013 for proceeds of nearly $700,000. Stetson and his investment vehicle, SCI, sold 500,000 BioZone shares between September 27, 2013 and December 18, 2013 for proceeds of nearly $300,000, and O'Rourke and ATG sold 250,000 BioZone shares between September 23, 2013 and December 27, 2013 for proceeds of nearly $150,000.

**The Scheme Defendants Cause BioZone to Sell Its Assets to a Related Party**

96.     In addition to Frost's large investment in MusclePharm, Honig, Brauser, Stetson, and O'Rourke each had invested in MusclePharm by the fall of 2013. Honig also held a lucrative consulting contract with MusclePharm through at

least July 2013. According to the SEC, Honig, Brauser, Stetson and O'Rourke exercised influence and control over the management decisions of MusclePharm in 2013.

97.      According to the SEC, the beneficial ownership of BioZone stock by Honig, Brauser, Grander, Opko, Stetson, SCI, FGIT, The Frost Group, and other co-investors including the Scheme Defendants, gave them collective control over BioZone, which they exercised through active involvement in the operations and promotion of BioZone, particularly by Honig, Brauser, and Stetson.

98.      On November 12, 2013, MusclePharm entered into an asset-purchase agreement with BioZone to acquire substantially all of BioZone's assets, including the Company's intellectual property and a manufacturing facility, in exchange for 1.2 million shares of MusclePharm stock.

99.      This transaction was extremely favorable for shareholders of MusclePharm, such as Honig, Brauser, Stetson, O'Rourke, and Frost, at the expense of BioZone shareholders. At the time, MusclePharm stock had a market value of $9.22 per share. The total value of the MusclePharm shares exchanged for BioZone's assets was approximately one fourth of BioZone's market capitalization at the time, representing a steep discount on the company's market value. According to the SEC, Maza did not learn of this transaction until after it was announced.

### The Scheme Defendants Cause BioZone to Merge with Cocrystal

100.   Once BioZone had sold off its assets and become a public shell, Honig and Brauser, with the knowledge and consent of Frost, arranged a reverse merger of BioZone with Old Cocrystal. Under the terms of the merger agreement, BioZone shareholders would own 40% of the post-merger entity and Old Cocrystal shareholders would own 60%.

101.   On November 27, 2013, BioZone issued a press release entitled, "BioZone Pharmaceuticals Announces Executed Letter of Intent to Merge With Cocrystal Discovery Inc," announcing an agreement to merge with privately held biotechnology company Old Cocrystal. Teva had previously invested in Old Cocrystal, as had The Frost Group and Opko—who together owned approximately 40% of Old Cocrystal.

102.   The merger was consummated on January 2, 2014. Frost had served as a director of Old Cocrystal since 2008, and continued to serve as a director of the post-merger Cocrystal.

103.   On March 18, 2014, the merged company reincorporated in Delaware under the name Cocrystal Pharma, Inc. On April 15, 2014, Cocrystal announced that its stock began trading under the new ticker symbol "COCP," changing from "BZNE" which was trading on the OTC Markets.

**The SEC Reveals The Scheme Defendants' Fraud; Some Scheme Defendants Reach Settlements**

104.   On September 7, 2018, the SEC issued a press release entitled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes" which included Frost, Honig, Stetson, Brauser, O'Rourke, Groussman, Maza, Keller, Ford, ATG, HSCI, Grander, Melechdavid, Opko, FGIT, Southern Biotech, and SCI as defendants. The SEC published its complaint on its website at https://www.sec.gov/news/press-release/2018-182.[4] The press release states, in relevant part:

> Washington D.C., Sept. 7, 2018 —The Securities and Exchange Commission today charged a group of 10 individuals and 10 associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock.
>
> According to the SEC's complaint, from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes. Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes. Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume. According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors.

---

[4] A copy of the SEC's initial complaint is attached hereto as Exhibit 2.

"As alleged, Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets," said Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement. "They failed to appreciate, however, the SEC's resolve to relentlessly pursue and punish participants in microcap fraud schemes."

The SEC's complaint, which was filed in federal district court in Manhattan, charges Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark Groussman, Frost, Elliot Maza, Robert Ladd, Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., OPKO Health Inc., Frost Gamma Investments Trust, Southern Biotech Inc., and Stetson Capital Investments Inc. with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief.

105.   The SEC's complaint and press release revealed in detail, for the first time, that the Scheme Defendants had engaged in a pump-and-dump scheme involving BioZone—identified in the SEC's complaint as "Company A"—and two other companies. The SEC's complaint also revealed for the first time that MusclePharm was an affiliate and related party of BioZone, and thus the sale of substantially all of BioZone's assets to MusclePharm was, in fact, a material related party transaction.

106.   On this news, shares of Cocrystal fell $0.58, or over 15.5%, over the next two trading days to close at $3.16 on September 11, 2018, damaging investors.

107.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

108.   On September 20, 2018, Frost stepped down as chairman of Ladenburg Thalmann Financial Services, a Miami-headquartered brokerage firm.

109.   On September 21, 2018, Ford settled with the SEC, agreeing to pay disgorgement and a civil penalty in an amount to be determined, and to be permanently enjoined from participating in penny stock offerings.

110.   On December 27, 2018, Frost, Opko, and FGIT, one of Frost's primary investment vehicles settled with the SEC, entering into separate consent judgments. Frost agreed to pay disgorgement of $433,181, plus $90,206 in interest, and a civil penalty of $5,000,000. Frost also agreed to be permanently enjoined from participating in any offering of a penny stock with limited exceptions, thus agreeing to be barred from participating in the small-cap market that he had touted as a key area of his expertise. Frost's agreement to pay a penalty more than ten times greater than his profits from the scheme and to be permanently barred from the penny stock market demonstrates the severity of his misconduct.

111.   Frost also agreed to be enjoined from violating numerous provisions of the federal securities laws, including to be permanently enjoined from violating Section 17(a)(2) by making materially untrue statements or omissions in connection

with sales of securities, to be permanently enjoined from violating Section 13(d) and Rule 13d-1(a) by failing to file required stock-ownership reports on Schedule 13D, and to be permanently enjoined from violating Sections 5(a) and (c) by selling unregistered securities.

112.   In its consent judgment with the SEC, Opko agreed to retain an independent consultant acceptable to the SEC to review, among other things, the Company's compliance with Section 13(d) in relation to investments made at the suggestion of and in tandem with Frost. Opko also agreed to establish a Management Investment Committee to make recommendations to an Independent Investment Committee of the board of directors to oversee its investment activities. Opko also agreed to pay a civil penalty of $100,000 and to be permanently enjoined from violating Section 13(d) and Rule 13d-1(a) by failing to file required stock-ownership reports on Schedule 13D.

113.   In FGIT's consent judgment with the SEC, FGIT agreed to be permanently enjoined from violating Section 17(a)(2) by making materially untrue statements or omissions in connection with sales of securities, and to be permanently enjoined from participating in any offering of penny stock.

114.   On January 18, 2019, Groussman and Melechdavid, his investment vehicle, agreed to consent judgments under which Groussman agreed to pay $1,051,360 of disgorgement, $170,555 of interest, and a penalty of $160,000, and

he and Melechdavid were permanently enjoined from violating Sections 10(b) and 13(d) of the Exchange Act, Rules 10b-5 and 13d-1(a), and Sections 5 and 17(a) of the Securities Act, and were enjoined for five years from participating in any penny stock offering.

115.   On March 8, 2019, the SEC filed its First Amended Complaint against the remaining defendants in the SEC Action.[5] Both of the SEC's complaints demonstrate that the SEC's investigation was thorough and incorporated substantial nonpublic information. Indeed, the SEC's First Amended Complaint refers to and quotes from nonpublic emails and documents that were created by, sent to, or received by key individuals and entities, including Honig, Stetson, BioZone, O'Rourke, and Ford. The SEC's First Amended Complaint also includes factual discussions of meetings and conversations between those individuals and others. Given that the SEC filed its First Amended Complaint after entering into consent judgments with Ford, Frost, FGIT, Opko, Groussman, and others, it is highly probable that the SEC's allegations are based on interviews with those individuals and documents produced by those individuals and entities, in addition to documents and information gathered through subpoenas and informal requests for documents and information.

---

[5] A copy of the SEC's Amended Complaint is attached hereto as Exhibit 3.

116.   On March 21, 2019, Maza settled the SEC's charges against him, agreeing to a consent judgment under which he was permanently enjoined from violating Section 10(b) of the Exchange Act, Rules 10b-5, and Section 17(a) of the Securities Act and from aiding and abetting any violation of Section 15(d) of the Exchange Act and Rule 15d-1. Maza also agreed that the court would determine whether he should be ordered to pay disgorgement, a civil penalty, and interest.

117.   On March 26, 2019, Keller settled the SEC's charges against him, agreeing to a consent judgment under which he was permanently enjoined from violating Sections 10(b) and 15(d) of the Exchange Act, Rules 10b-5 and 15d-1, and Section 17(a) of the Securities Act, participating in any penny stock offering, or acting as an officer or director of any public company. Keller also agreed to pay disgorgement, interest, and a civil penalty in an amount to be determined by the court.

118.   On June 17, 2019, Honig settled the SEC's charges against him, agreeing to a consent judgment under which he was permanently enjoined from violating Sections 10(b), 9(a)(1), 9(a)(2), and 13(d) of the Exchange Act, Sections 17(a) and 5 of the Securities Act, and Rules 10b-5 and 13d-1(a), participating in any penny stock offering, holding 5% or more beneficial ownership of any penny stock issuer, or promoting, controlling, or funding any penny stock issuer. Honig also

36

agreed to pay disgorgement, interest, and a civil penalty in amounts to be determined by the court.

### **Frost, Honig and Brauser Were a Close-Knit Group of Serial Fraudsters**

119.   According to the SEC, Honig, Brauser, Stetson, and O'Rourke, as well as some combination of their investment vehicles, were "[a]t the center" of the pump-and-dump schemes. The SEC described Honig as the "primary strategist."

120.   This fraudulent scheme involved the same small group of players who had worked together for years: Frost, Honig, Stetson, Brauser, Ford, O'Rourke, Groussman, and their respective investment vehicles. For years, this group repeatedly engaged in pump-and-dump stock manipulation schemes together, shared business addresses and letterhead, jointly owned investment companies they used to conceal their role in investments, and invested in tandem.

121.   According to the SEC, Honig, Brauser, Stetson, and O'Rourke invested together in at least 19 issuers at or about the same time from 2011 to 2019, and Frost invested with them in a number of these deals. This group had a distinctive *modus operandi*, which they executed with many of these companies, including BioZone.

122.   In most cases, this investing group would identify a target company and arrange financing to give the investing group and their chosen co-investors a controlling position in the company's outstanding common stock at below-market prices. The group would then exercise control over the company, dictating the

company's management decisions and policies and voting together to direct major business decisions. The group would then engineer a publicity-generating event, such as a public investment by Frost or an article from Ford, to drive the stock price higher and create sufficient demand and trading volume so that they could sell their positions. The group would then dump their stock at artificially inflated prices, generally staggered over the course of a few weeks to avoid detection.

123.   According to the SEC, Honig, Stetson, Brauser, and O'Rourke were in nearly daily contact, largely working out of the same office. Brauser and Honig rented offices from at least October 2010 to 2013 in Miami, in the former Ivax building, which is owned by Frost and houses his office.

124.   In 2012-2013, Ford wrote promotional articles not only about BioZone, but also about Opko and other companies controlled by Frost or his associates, including Pershing Gold Corp. ("Pershing Gold"), MusclePharm, ChromaDex Corp. ("ChromaDex"), and Vringo, Inc. Indeed, the SEC Complaint states that in November and December 2013, Honig, O'Rourke, and Brauser secretly paid Ford to write an article touting Opko.

125.   According to the SEC, the same lawyer, Harvey Kesner, and his firm were retained at Honig's insistence by BioZone, MabVax Therapeutics, Inc. – one of the other pump and dump schemes perpetrated by Honig, Brauser, and their associates, identified in the SEC's complaint as "Company B" – and other issuers in

which Honig and Frost invested. *Barron's* reported on October 4, 2018, in an article entitled "The Lawyer at the Center of the SEC Pump-and-Dump Case" that during the past decade, Kesner represented nearly two dozen public companies backed by Honig or other defendants in the SEC action. Kesner resigned from his law firm shortly before the SEC filed its action.

126.   According to the SEC's complaint, Honig, Groussman, Brauser, Stetson, and O'Rourke committed another pump-and-dump scheme using a company called MGT Capital Investments Inc. ("MGT"), identified in the SEC's complaint as "Company C," using a similar *modus operandi*.

127.   Frost, Honig, Brauser, Groussman, and Stetson also invested together in a number of penny stocks bearing similar indicia of pump-and-dump schemes, including VBI (invested in by Opko, Honig, and Brauser), ChromaDex (invested in by Opko and FGIT, co-chaired by Honig and Brauser, and touted by Ford), MusclePharm (invested in by FGIT, Honig, and Brauser and touted in anonymous emails to investors), Sevion (invested in by Opko, Honig, and Brauser), TransEnterix, Inc. (invested in by FGIT and Brauser), IZEA, Inc. (invested in by Honig, Brauser, and FGIT), Pershing Gold (managed by Honig and invested in by FGIT), and PolarityTE, Inc. (invested in by FGIT, Honig, and Brauser; Stetson was its CFO and was terminated following the SEC Complaint).

128.   In the wake of their run of illicit stock promotion schemes, Frost, Honig, Brauser, Stetson, Groussman, and O'Rourke, along with a number of their co-investors including some of the Scheme Defendants, have been named as defendants in multiple securities fraud class actions alleging millions of dollars in damages to investors. Those actions include, among others, Opko, *In re Opko Health, Inc. Sec. Litig.*, No. 18-cv-23786-JEM (S.D. Fla.), MGT, *Guyer v. MGT Capital Investments, Inc.*, No. 18-cv-9228 (S.D.N.Y.), and Riot Blockchain f/k/a Venaxis, Inc., *Takata v. Riot Blockchain, Inc.*, 18-cv-2293 (D.N.J.).

129.   Honig and Ford also had a long-standing partnership by which Honig would pay Ford to write promotional articles about companies Honig and his associates invested in. According to the SEC, Honig first met Ford in the summer of 2012 in San Francisco. At that meeting, Honig and Ford agreed that Honig would secretly compensate Ford to write about companies Honig would pick out, and Ford would not publicly disclose that compensation in order to fool investors into believing that Ford's articles were free from any conflict of interest.

130.   According to the SEC, between 2012 and 2015, Ford wrote and published purportedly independent stock analysis promoting a number of companies in which Honig and his co-investors held interests. Ford acted at Honig's direction, and often communicated through Stetson and O'Rourke, in return for, among other things, the right to participate in off-market securities transactions or Honig-led

private placements and at least $125,000 in cash payments during the period. Moreover, Honig would structure the cash payments to disguise their source by enlisting third parties associated with Honig to enter into sham consulting agreements with Ford.

131.   According to the SEC, Honig, Stetson and O'Rourke knew that Ford was writing the promotional articles because they were paying him to do so, and they knew Ford was not disclosing this compensation in his articles. Brauser also knew that Honig was paying Ford for the articles without disclosing the compensation. According to the SEC, in November 2013, Honig copied Brauser and O'Rourke on an email concerning a promotional plan for Opko, which included Ford publishing a promotional article. Honig stated in the email that "we are assisting" on the drafting of the "John Ford article." In December 2013, O'Rourke sent Brauser and email with a link to Ford's Opko article, which did not disclose that Ford was compensated for writing it.

132.   According to the SEC, Brauser, Honig, Stetson and O'Rourke each regularly followed news and articles about the companies in which they invested, and they each knew that Ford's promotional articles did not disclose his compensation arrangements with Honig.

**Cocrystal's Continued Connections to the Scheme Defendants**

133.   Cocrystal employed MDM Worldwide Solutions, Inc. ("MDM") for the purpose of investor relations from at least 2014 through 2016. MDM is listed as the contact on the Company's press releases beginning on at least May 22, 2014. David Zazoff, a partner at MDM, is identified in the Company's press releases as its MDM contact.

134.   Zazoff also provided investor relations services to BioZone dating back to at least 2011. In a BioZone press release dated July 8, 2011, ZA Consulting, Inc. was listed as the investor relations contact. Zazoff was the Managing Director of ZA Consulting, Inc.

135.   Honig had a history of working closely with Zazoff to promote stocks prior to Cocrystal. In May 2014, Joel Noel was charged with securities fraud in connection with the securities of YesDTC Holdings, Inc. Noel plead guilty in June 2014 and began cooperating with the government's investigation. In Noel's plea agreement, he details Honig's involvement in the YesDTC securities fraud. In particular, Noel notes that Honig introduced him to Zazoff, who Honig said would promote YesDTC stock. "Honig said Zazoff was a 'magic maker,' who could make the price of YesDTC stock rise through his services. Honig made it clear that I should not ask questions about how Zazoff achieved his success." The plea agreement goes

on to detail how Zazoff promoted YesDTC stock from the Spring of 2010 through July 2011.

136.   Zazoff, MDM, and other Zazoff-associated firms have acted as paid investor-relations representatives for at least 10 companies created or bankrolled by Honig and his associates, including two of the companies identified in the SEC's complaints: BioZone and Mabvax.

137.   Another promoter, Samuel J. Rae, posted approximately 180 articles on *Seeking Alpha* and similar investment sites over the past five years, nearly half of which featured or referenced companies backed by Honig, Brauser, Frost, and their associates.

138.   On September 30, 2013, just four days after Ford's *Seeking Alpha* article, Rae also posted a bullish article on BioZone on the website Benzinga.com. Rae's article hyped BioZone as "Dr. Frost's Next Big Thing." Just as Ford's article did, Rae's article touted Frost's involvement and BioZone's continued development of its QuSomes technology.

139.   Zazoff and Rae's continued involvement with the promoting the Company, along with numerous other companies associated with Honig and the Scheme Defendants, demonstrates the Scheme Defendants' continued influence and control over the Company in the years after the Cocrystal merger.

**Defendants Made False and Misleading Statements and Violated GAAP by
Failing to Disclose Material Related Party Transactions**

140.  GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

141.  GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

142.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

143.  SEC, NYSE, and NASDAQ rules and regulations require that publicly traded companies such as Cocrystal include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X ("Reg. S-X").

144.  SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

145.   Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. ... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

146.   The Company was required to disclose material transactions between the Company and MusclePharm in the Company's financial statements because MusclePharm was a related party to the Company.

147.   GAAP required the Company to disclose all material related party transactions.

148.   ASC 850, *Related Parties*, provides that a public company's "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1.

149.   "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." ASC 850-10-05-3. "Affiliate" includes

any company that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise. ASC 850-10-20.

150.   Disclosures of related party transactions shall include: (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

151.   MusclePharm was an affiliate of, and thus a related party to, the Company. As noted herein, Frost, Honig, Brauser, Stetson, and O'Rourke, along with the other Scheme Defendants to varying extents, controlled both MusclePharm and BioZone. These facts demonstrate that MusclePharm was an affiliate of, and related party to, the Company.

152.   On November 18, 2013, the Company filed a quarterly report on Form 10-Q for the quarter ended September 30, 2013 (the "13Q3 10-Q") with the SEC, which provided the Company's third quarter 2013 financial results and position. The 13Q3 10-Q was signed by Defendant Maza.

153.   The 13Q3 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Maza attesting to the accuracy of the 13Q3 10-Q. Maza certified that the 13Q3 10-Q "does not contain any untrue [or misleading] statement of a material fact." Maza also each certified that he had disclosed to the Company's auditor and audit committee "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

154.   The 13Q3 10-Q SOX certifications were materially false and misleading because Maza was aware, but failed to disclose to the Company's auditor or audit committee, that the Scheme Defendants, including Maza and Keller, were engaged in a fraudulent pump-and-dump scheme to artificially inflate the Company's stock price and trading volume and then sell their shares to the detriment of BioZone investors.

155.   The 13Q3 10-Q SOX certifications were also materially false and misleading because Maza was aware that the 13Q3 10-Q contained a misleading statement of material fact concerning BioZone's sale of substantially all of its assets to MusclePharm.

156.   The 13Q3 10-Q stated that:

… in November 2013, the Company entered into an Asset Purchase Agreement (the "November APA") with MusclePharm Corporation ("Musclepharm"). In connection with the November APA, the Company agreed to sell substantially all of the Company's operating

47

assets including the QuSomes, HyperSorb and EquaSomes drug delivery technologies (excluding certain assets including cash on hand) for 1,200,000 shares of Musclepharm's common stock.

157.   This statement was materially false and misleading because MusclePharm was a related party of the Company and the Company was required to, but did not, disclose its material transactions with MusclePharm, including the nature of the relationship, a description of the transactions for each period for which income statements are presented, and such other information necessary to an understanding of the effects of the transactions on the financial statements. *See* ASC 850-10-50-1.

158.   On March 31, 2014, the Company filed a Form 10-K for the year ended December 31, 2013 (the "2013 10-K") with the SEC, which provided the Company's full year 2013 financial results and position. The 2013 10-K was signed by Defendants Wilcox, McGuire, and Frost. The 2013 10-K contained SOX certifications signed by Defendants Wilcox and McGuire, attesting to the accuracy of financial reporting, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Wilcox and McGuire each disclosed "[a]ny fraud, whether or not material" to the Company's auditor and audit committee.

159.   The 2013 10-K stated that: "On January 2, 2014, the Company sold Material substantially all its operating assets, including its manufacturing facility in

California, to Musclepharm Corporation ('Musclepharm'), a public company trading on the OTCBB, in exchange for 1,200,000 shares of Musclepharm common stock…."

160.    On April 4, 2014, the Company, filed a Form 10-K/A for the year ended December 31, 2013 (the "2013 10-K/A") with the SEC, which provided the Company's full year 2013 amended financial results and position. The 2013 10-K/A was signed by Defendants Wilcox, McGuire, and Frost. The 2013 10-K/A contained SOX certifications signed by Defendants Wilcox and McGuire, attesting to the accuracy of financial reporting, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Wilcox and McGuire each disclosed "[a]ny fraud, whether or not material" to the Company's auditor and audit committee.

161.    The 2013 10-K/A stated that: "[o]n January 2, 2014, the Company sold substantially all its operating assets, including its manufacturing facility in California, to Musclepharm Corporation ('Musclepharm'), a public company trading on the OTCBB, in exchange for 1,200,000 shares of Musclepharm common stock…."

162.    On March 31, 2015, the Company filed a Form 10-K for the year ended December 31, 2014 (the "2014 10-K") with the SEC, which provided the Company's full year 2014 financial results and position. The 2014 10-K was signed by

Defendants Wilcox, McGuire, Meckler, and Frost. The 2014 10-K contained SOX certifications signed by Defendants Wilcox and McGuire attesting to the accuracy of financial reporting, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Wilcox and McGuire each disclosed "[a]ny fraud, whether or not material" to the Company's auditor and audit committee. The 2014 10-K also stated that "[t]he [Company's] financial statements are prepared in accordance with accounting principles generally accepted in the United States ('GAAP')."

163.   The 2014 10-K stated that "[o]n January 2, 2014, the Company sold substantially all of its assets to MusclePharm Corporation ('MusclePharm')...."

164.   On March 15, 2016, the Company filed a Form 10-K for the year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided the Company's full year 2015 financial results and position. The 2015 10-K was signed by Defendants Meckler, Wilcox, Dale, and Frost. The 2015 10-K contained SOX certifications signed by Defendants Meckler and Dale attesting to the accuracy of financial reporting, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Meckler and Dale each disclosed "[a]ny fraud, whether or not material" to the Company's auditor and audit committee. The 2015 10-K also stated that "[t]he [Company's] financial statements

are prepared in accordance with accounting principles generally accepted in the United States ('GAAP')."

165.   The 2015 10-K stated that: "[o]n January 2, 2014, the Company sold substantially all of its assets to MusclePharm Corporation ('MusclePharm')…."

166.   On March 31, 2017, the Company filed a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's full year 2016 financial results and position. The 2016 10-K was signed by Defendants Wilcox, Martin, and Frost. The 2016 10-K contained SOX certifications signed by Defendants Wilcox and Martin attesting to the accuracy of financial reporting, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Wilcox and Martin each disclosed "[a]ny fraud, whether or not material" to the Company's auditor and audit committee. The 2016 10-K also stated that "[t]he [Company's] financial statements are prepared in accordance with accounting principles generally accepted in the United States ('GAAP')."

167.   The 2016 10-K stated: "[o]n January 2, 2014, Biozone Pharmaceuticals, Inc. sold substantially all of its assets to MusclePharm Corporation ('MusclePharm')…."

168.   On March 21, 2018, the Company filed a Form 10-K for the year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's

full year 2017 financial results and position. The 2017 10-K was signed by Defendants Wilcox, Martin, and Frost. The 2017 10-K contained SOX certifications signed by Defendants Wilcox and Martin attesting to the accuracy of financial reporting, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Wilcox and Martin each disclosed "[a]ny fraud, whether or not material" to the Company's auditor and audit committee. The 2016 10-K also stated that "[t]he [Company's] financial statements are prepared in accordance with accounting principles generally accepted in the United States ('GAAP')."

169.   The 2016 10-K stated: "[o]n January 2, 2014, Biozone Pharmaceuticals, Inc. sold substantially all of its assets to MusclePharm Corporation ('MusclePharm')…."

170.   The statements referenced in ¶¶156-169 above were materially false and misleading because MusclePharm was a related party of the Company and the Company was required to, but did not, disclose its material transactions with MusclePharm, including the nature of the relationship, a description of the transactions for each period for which income statements are presented, and such other information necessary to an understanding of the effects of the transactions on the financial statements. *See* ASC 850-10-50-1. As a result, Defendants' statements

about Cocrystal's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

171.   The Officer Defendants knew, or were reckless in not knowing, of Honig, Brauser, and Frost's continuing influence and control over the Company, and that MusclePharm was an affiliate and related party of the Company when it acquired substantially all of BioZone's assets.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

172.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Cocrystal and/or BioZone during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

173.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ or OTC. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate

discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

174.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

175.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

176.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)   whether Defendants' acts as alleged violated the federal securities laws;

    (b)   whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

177.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

178.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in an efficient market;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ or OTC, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

179.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

180.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

181.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

182.  This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

183.   During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

184.   The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

185.   The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

186.   Individual Defendants, including the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

187.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

188.   Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants

did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

189.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

190.   By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 9(a) and (f) of the Exchange Act
### Against the Scheme Defendants

191.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

192.   During the Class Period, the Scheme Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (2) engaged in a scheme to inflate the price of Cocrystal's securities; and (3) mislead and caused Plaintiffs and other members of the Class to purchase Cocrystal's securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

193.   The Scheme Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Cocrystal's securities in an effort to maintain artificially high market prices for Cocrystal's securities in violation of Sections 9(a) and 9(f) of the Exchange Act. The Scheme Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

194.   By virtue of the foregoing, the Scheme Defendants made statements which were at the time and in the light of the circumstances under which they were made, false or misleading with respect to the value of Cocrystal securities which Defendants knew or had reasonable ground to believe were so false or misleading.

195.   The Scheme Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make said false or misleading statements with respect to the value of Cocrystal securities which Defendants knew or had reasonable grounds to believe were so false or misleading.

196.   Each of the Scheme Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Scheme Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Scheme Defendants, by virtue of his responsibilities and activities as a senior officer, and/or director of the Company, and/or agent of the Company was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Scheme Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these Scheme Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

197.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Cocrystal's true value and the Scheme Defendants' price manipulation, which was not disclosed by the Scheme Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired

Cocrystal securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

198.   By virtue of the foregoing, the Scheme Defendants violated Section 9(a) and 9(f) of the Exchange Act, 15 U.S.C. § 78i(a) and 78i(f).

199.   As a direct and proximate result of the Scheme Defendants' conduct as described herein, Plaintiffs have suffered significant damages and are entitled to such damages from the Scheme Defendants, jointly and severally.

200.   This action was filed within one year of discovery of the fraud and within three years of Plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### Against the Officer Defendants

201.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

202.   During the Class Period, the Officer Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

63

203.   As officers and/or directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

204.   Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Officer Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Officer Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

205.   Each of the Officer Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Officer Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Officer Defendants exercised control over the general operations of the Company and possessed the

64

power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

206.   By reason of the above conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## COUNT IV

### Violation of Section 20(b) of the Exchange Act
### Against the Scheme Defendants

207.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

208.   By their conduct as alleged above, the Scheme Defendants directly and indirectly, acted through and used another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

209.   In acting through and using another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Scheme Defendants acted intentionally, knowingly or with severe recklessness with respect to the truth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: June 25, 2019                    Respectfully submitted,

                                        **THE ROSEN LAW FIRM, P.A.**

                                        By: /s/ Laurence M. Rosen
                                        Laurence M. Rosen
                                        609 W. South Orange Avenue, Suite 2P
                                        South Orange, NJ 07079
                                        Tel: (973) 313-1887
                                        Fax: (973) 833-0399
                                        Email: lrosen@rosenlegal.com

                                        Joshua Baker (admitted *pro hac vice*)
                                        Phillip Kim (admitted *pro hac vice*)
                                        101 Greenwood Avenue, Suite 440
                                        Jenkintown, PA 19046
                                        Tel: (215) 600-2817
                                        Fax: (212) 202-3827
                                        Email: jbaker@rosenlegal.com
                                                pkim@rosenlegal.com

                                        *Lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of June, 2019, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

A true and correct copy of the foregoing document was also served via email on counsel for the following Defendants:

**PERKINS COIE LLP**
Jeffrey D. Vanacore
Ronald Berenstain
Sean Knowles
Email: jvanacore@perkinscoie.com
         rberenstain@perkinscoie.com
         sknowles@perkinscoie.com

*Attorneys for Defendants Cocrystal Pharma Inc., Gary Wilcox, Gerald McGuire, James Martin, Curtis Dale, and Jeffrey Meckler*

**KAPLAN HECKER & FINK LLP**
Sean Hecker
Jenna Dabbs
Benjamin White
Email: shecker@kaplanhecker.com
         jdabbs@kaplanhecker.com
         bwhite@kaplanhecker.com

*Attorneys for Defendant Mark Groussman*

**MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.**
Robert J. Anello
Edward Spiro
Email: ranello@maglaw.com
         espiro@maglaw.com

*Attorneys for Defendant Phillip Frost*

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Randy Luskey
Email: rluskey@orrick.com

*Attorneys for Defendant John O'Rourke III*

**PETRILLO KLEIN & BOXER LLP**
Nelson A. Boxer
Email: nboxer@pkbllp.com

*Attorneys for Defendant Elliot Maza*

**CHIESA SHAHINIAN & GIANTOMASI PC**
A. Ross Pearlson
Email: rpearlson@csglaw.com

*Attorneys for Defendant John H. Ford*

**MILBANK LLP**
Adam Fee
George Canellos
Email: afee@milbank.com
      gcanellos@milbank.com

*Attorneys for Defendant John Stetson*

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
Michael Sommer
Email: msommer@wsgr.com

*Attorneys for Defendant Barry C. Honig*


/s/ Laurence M. Rosen